IN THE UNITED STATES DISTRICT COURT

                  FOR THE WESTERN DISTRICT OF OKLAHOMA


JAMES MIRELES and CARMEN MIRELES,

          Plaintiffs,

vs.                                 Case No. CIV-21-843-F

LIBERTY INSURANCE CORPORATION,

          Defendant.

----------------------------



                    TRANSCRIPT OF DAUBERT MOTION

                 BEFORE THE HONORABLE STEPHEN P. FRIOT

                    UNITED STATES DISTRICT JUDGE

                        DECEMBER 16, 2022

                           1:30 P.M.




                           APPEARANCES


FOR THE PLAINTIFFS:  Mr. Ben D. Baker, Red Dirt Legal, PLLC,
201 North Broadway Street, Suite 111, Moore, OK 73160


FOR THE DEFENDANT:  Ms. Margo E. Shipley and Mr. William W.
O'Connor, Hall Estill – Tulsa – 320 S. Boston Ave., Suite 200,
Tulsa, OK 74103

Proceedings reported by mechanical stenography; transcript
produced by computer-aided transcription.

(PROCEEDINGS HAD ON DECEMBER 16, 2022.)

THE COURT:  Good afternoon.  We're here in Civil 21-843, James Mireles and Carmen Mireles vs. Liberty Insurance Corporation, for a hearing on a Daubert motion.

Counsel will please give your appearances.

MR. BAKER:  Ben Baker appearing on behalf of the plaintiffs.

MR. O'CONNOR:  Bill O'Connor and Margo Shipley for defendant.

THE COURT:  Okay.  Thank you.  Give me just a minute to get organized here.

Okay.  I have, as everyone has a right to expect, carefully reviewed the briefs and all the attachments to the briefs.  As you might gather from Exhibit 5 to the defendant's response, I have had some experience with motions that are, in some ways, similar to the one that we have before the Court, but I'm also keenly aware of the fact that it's my duty to look at every case and every motion as something that should be looked at on its own two feet and that I should not be necessarily tempted to say, well, this is one of those motions and, therefore, that's the outcome of it.  So that's not going to be my approach, but, yes, there is probably a little bit of room for observation of my thinking in the motion -- in the attachment number 5 to the defendant's response.

So with that, it's plaintiffs' motion.  Plaintiff is

displeased with the proposed testimony of Mr. Jayne as an expert to be called, if all goes as Liberty expects, by Liberty Insurance Corporation.

So since it's plaintiffs' motion, I will hear first from the plaintiff in support of the motion. And if you would begin by letting me know whether I may expect anything other than argument.

MR. BAKER: Good afternoon, Your Honor. No.

THE COURT: Very well. And if you would, pull that microphone up a little bit where it points right straight at you. That's good. Thank you.

MR. BAKER: Yes, sir. Your Honor, beyond anything that we've included in the brief, upon review of the defendant's response, I think we probably want to be clear -- I think we were -- it's not about Mr. Jayne's qualifications. We're not questioning that. It's more the opinions that he rendered, which our position is they actually aren't opinions but, rather, they're legal conclusions which are disguised as nothing more than trying to direct the jury into what decision -- or rendering a legal conclusion.

THE COURT: Well, I hate to interrupt you, but what about his qualifications as a roof expert? On page 13 he says, "It is my opinion that the vast majority of the damage to the plaintiffs' roof was a result of wear and tear rather than wind or hail."

MR. BAKER: Oh, no. That -- we believe he's qualified there. I was -- as he was defined as someone who would know policy or the definition of what he was to render an opinion on. As a roofer or engineer or a damage -- person to identify damage, I do not believe he's qualified.

THE COURT: Okay. Well, his CV shows that, unlike me, he was an Order of the Coif, but I don't know a single member of the Order of the Coif who, by virtue of that, is qualified to opine as to the cause of damage to a roof. And he clearly purports to opine as to the cause of damage to this roof.

So I do appreciate that clarification, and I will certainly welcome the defendant's views as to whether -- as he clearly does; he opines as to the physical cause of damage to the roof -- whether his law degree -- how far his law degree gets him down that road.

But anyway, you may continue.

MR. BAKER: Yes, sir.

As to the legal standards that he -- or the standards that he purports really are nothing more than -- are really nothing more than the general legal standards we have here in Oklahoma. Insurance industry standards are legal standards. They're supposed to be reasonable and timely.

And if you look at the documents that he reviewed, he did not review his company's own -- or Liberty Mutual's own

operating guide, their own internal policies. He doesn't discuss how each individual insurance company has their own operating guides and inspections policies. He doesn't do anything to compare against the industry but, rather, recites to the Court -- or to opine to the jury -- the legal standard and then says it's reasonable and timely -- it's the standard and they were reasonable and timely.

So our position is that everything he's doing is very conclusory. It goes to the heart of what the jury has been put in place to do, which is make an ultimate decision. And, again, not to reiterate our brief, but there's nothing technical about trying to decide, when you go through which evidence will be presented during the course of the trial, when things happened, when claims were called in, when inspections were done. And the jury certainly doesn't have to be any type of insurance expert to decide whether or not an inspection was done timely, whether an appraisal was finished timely. Those are things that they can render once the Court has given and directed what the legal standard is, as far as reasonable and timeliness, from there.

So I don't believe that -- I don't believe that he actually did a sufficient job in regards to setting up the standard to compare against or rendering an opinion there but, rather, a conclusion as to -- against the legal standard. It's just guised underneath what -- putting a bad-faith expert on

the stand is fraught with danger. We don't see them a whole lot anymore because the purpose of it is to try to direct the jury --

THE COURT: Well, let me interrupt with a question.

MR. BAKER: Sure.

THE COURT: And I understand one of your overarching points, and that is, as my beloved late colleague Lee West sometimes said when we would have a -- and I think he might have said this in the context of a bad-faith insurance case -- that it rubbed him just a little bit the wrong way to hire a lawyer to take the stand as a witness and give your closing argument under oath. That's a little bit of an oversimplification, but that was Lee West's very characteristic, pungent way of describing the situation. So I understand your basic point.

But you may have gotten a little bit of insight into what my thinking was, at least in another case, when you saw the transcript of my ruling in the 2017 case that was attached to the defendant's response. So let me ask you this. And I have a couple of more specific questions on other aspects of it.

But as you may have gathered from that transcript, my approach, at least in that case, was, number one, I'm not going to allow the expert, be it a plaintiffs' expert or a defense expert, to come and just expound, straight up, on the law to the jury. That's the job for my jury instructions.

And as consistent with Specht v. Jensen, I'm not going to allow the expert to tell the jury what its decision must be on the issue of liability or, for that matter, as a matter of law on any other issue.

Number three, we get into a little bit of a sticky wicket when we talk about standards because the applicable standards are derived partly from the law and partly from commonly accepted industry practice.

So, number four, I have had an inclination to allow the witness, be it lawyer or not, to expound on standards that apply even though substantive law is written, to some degree, or woven into those standards.

And so that's, in substance, what I did in that 2017 case. And this is your chance to say, well, I need to rethink some of that.

MR. BAKER: I believe that the issue or problem with that today and in our current situation is -- and bear with me if I try to pick the correct words to convey this -- is in our current situation with Mr. Jayne -- and no disrespect meant to him at all, certainly not -- but there starts with a distinct advantage because of him being an attorney and having practiced in the area that beyond a normal or general expert that we would place or call that would opine in regards to someone that has actually worked as an adjuster -- I appreciate that he has an adjuster license and he took the test -- regards his working

as an adjuster, having worked for an insurance company or in the field prior to becoming a lawyer or in place of becoming a lawyer, it gives an inherent solidification to that testimony if he's allowed to opine in regards to the standards.

What I think also sets this apart, different from before, is that he didn't opine nor did he even review standards beyond the general legal standard into his report. So with having as part of discovery -- I think the -- our Bates Stamp numbers were 1462 to 1572 were the internal operating guide and inspection adjuster practices that they have there.

That would have been a great place to have compared against to have said this adjuster in this situation followed their own internal guidelines and then measured against the industry standard, which are -- not the legal standard, but every company has them -- are generally this. He failed to go there. He jumped straight to the conclusion here is the general legal standard and now I'm going to measure against that and just concluded that this particular situation, this particular defendant, is within compliance.

With not having a starting spot that is -- that has sprung forth from the industry but, rather, from the legal field, it would certainly disadvantage plaintiff significantly, I think, from -- to opine from that position because the base is so narrow from that starting point as opposed to it being broader and having incorporated, well, his own client to begin with and

then the industry as a whole.

THE COURT: Well, by way of maybe a little bit of backdrop for my consideration of that, let me ask you. You've made reference to the standard -- okay. Yeah, here we are on page 12. The industry standard, "for a proper claims investigation requires an insurance carrier to conduct a reasonable and timely claims investigation under the circumstances." Well, that's admittedly a fairly mealy-mouthed, subjective standard, but is the plaintiff going to -- either by way of an expert or by way of a discernable substantive provision of the law, going to come up with any more definitive standard than that?

MR. BAKER: Well, I believe that that, again, is the general legal standard that we would have -- that the general legal standard that would apply. So what he's done is he's --

THE COURT: Wait, wait. The pending question is whether the plaintiff is going to advocate any more definitive or any more specific standard than that.

MR. BAKER: Than reasonableness on investigation and timeliness, we know that each situation is different. We would probably apply -- Your Honor, I honestly would have to stop and think about that one for a second. I think they can obviously be much more expansive.

THE COURT: Well, for instance, maybe there is a property and casualty insurance association and maybe that

property and casualty insurance association puts out some model protocols for claims investigation. And maybe paragraph 14 of that protocol says, well, if there's roof damage, then you need to be out there looking at it and take a position on it within 30 days. I mean, are we going to hear anything more than what I, I think justifiably, called the mealy-mouthed reasonable and timely standard?

MR. BAKER: Yes, sir.

THE COURT: Are we going to hear anything more definitive than that?

MR. BAKER: We will. So there will be questions and we measured against whether they've followed their own internal protocol and then, additionally, whether or not we followed -- and obviously, I know we can't talk about the Fair Claims Practices Act. We understand that. There's obviously guidelines that are out there in regards to the time frame that the claims are supposed to turn, communications in regards to that, keeping claims open regardless of inspections and so forth from there. So I think beyond the standard we will be offering specific portions that they failed to follow or to address.

Just sitting here thinking off the top of my head, it would be one from Mr. Jayne's opinion. He concluded that -- I can't remember the page here directly, but that Mr. Rogers not inspecting the barn was fine because the plaintiffs had not

pointed that portion of it out or made a claim there and it was 200 yards apart where the barn was actually about 50 or 75 yards away. And there's testimony from Mr. Rogers that he's like, well, I would have inspected had I seen it, I just didn't even notice it, when we took his deposition, which is kind of a 180 from plaintiffs failing to report it to Mr. Rogers saying I didn't notice it, and had I noticed it, I would have inspected it at the time.

So those are things that whenever we get back -- I know it's fact driven, a portion of it, but to fall in under the broader, I guess mealy-mouthed type of standard here I think is dangerous with this one having a lot of moving components with the appraisal, with portions of the claim that weren't inspected initially, the denial of participating in the appraisal fully. There's just a lot of components that are going to fall into that that we'll get into a lot more of the specifics.

In particular, also, too, when we look at the appraisal, we'll be looking at adopting 36 O.S. 4803, as a portion of it, which has a very strict set of rules to follow through on that and whether or not they followed there.

THE COURT: Let me back up a little bit. Will plaintiff contend at the trial of this case that Liberty failed to comply with any of its own internal claims investigation and processing criteria?

MR. BAKER: Our review right now it appears that they did not, Your Honor.

THE COURT: Okay. Now, you mentioned the Fair Claims Practices Act. I'm certainly well aware, at least the last time I looked at it, that a violation of that act is not, in and of itself, actionable as a freestanding cause of action, but I have permitted experts to refer to one or more of those standards as informing, in part, his or her evaluation of the case as an expert.

The case that comes up, as I recall, was I believe a UM case in which I think the Fair Claims Practices Act says you can't hold the undisputed part of the claim hostage pending resolution of the rest of it. And I permitted an expert to refer to that, not as a free-standing cause of action but simply as one source of common sense or industry standards or whatever -- commonly accepted standards perhaps is a better way to put it -- that should inform the handling by an insurance company of a claim.

Is there -- so bearing that in mind, and without predetermining anything, do you anticipate that -- either through an expert or otherwise, that you would be suggesting a violation of any particular standard in the Fair Claims Practices Act, bearing in mind, obviously, that that's not, in and of itself, a freestanding cause of action?

MR. BAKER: Yes, sir, Your Honor. I understand. We

are -- as we head towards document submission and things, one of the things that we're seeing most commonly -- and quite honestly, we haven't gotten to the spot with Mr. O'Connor yet to where we've done these rounds of submissions. But we've frequently seen where, while plaintiff is relegated generally from being able to speak or talk about it, we see plaintiff, or excuse me, defendant want to pull back in and use that in their course of defenses, either in motions in limine or to talk about in regards to their ongoing investigation that they did once the litigation started and use that as a crutch or a tool to say we were in compliance.

And certainly when we start looking at what -- under Buzzard as far as what you knew at the time or even if we're looking at a contract claim, while we may not ask for specific reference to them, we don't believe that that should be a paper tiger that rests there to where there's no civil consequences for you to be able to violate, then turn around and use the very thing that you violated as a defense mechanism inside the courtroom.

So we may look to the Court to request that they be limited from presenting certain defenses or portions of a policy that they did not cite or reference as a basis for a denial during the course of the adjustment of the claim. So from that standpoint, we could anticipate that being forthcoming, probably by way or form of a motion in limine.

THE COURT: One more question. Do you -- I presume plaintiffs have a claims handling expert of some sort; is that right?

MR. BAKER: Yes, sir.

THE COURT: And is he or she going to opine on this reasonable and timely claims investigation under the circumstances standard that Liberty's handling of this claim violated that standard?

MR. BAKER: I should clarify, Your Honor. And I apologize. I don't want to have misspoken or misled the Court. We did not qualify an expert with the Court. We have an individual who is well qualified, handles claims, has -- is credentialed, well credentialed, in claims handling that is a fact witness and will be able to talk about the role and the position throughout the handling of the claim and what he observed and saw. And if -- and we have, you know, had this argument in the Northern District, which in that situation, we were limited to those -- that person's opinion being limited to that particular set of facts in that case and not going beyond into the industry.

THE COURT: Well, has this individual prepared a Rule 26(a) report?

MR. BAKER: They have not. They'll be a fact witness is what they will be. And so we're going to be required or questioning as far as factually what transpired, what happened

in regards to -- in regards to the handling claim, what their exchanges were with the company and such from there.

I would line it up much the same as if you have a treating physician, say, in a personal injury case as opposed to the expert. The treating physician doesn't lay down his qualifications as a medical doctor when he steps in and offers testimony, but he's there to testify factually as to what he saw and what he did, much the same in that scenario. I believe that was actually the example -- and I'm trying to remember which courtroom it was at -- I think it was Judge Eagan's in the Northern District that made that analogy and said that the person testifying is not expected to lay down their qualifications in that regard simply because they're a fact witness.

So that would be our position in that regard. So I misspoke and I'm sorry. In my mind, they are an expert, but in this particular situation, while we have used them as an expert in the past, we did not qualify them because of their hands-on involvement in the case and will use them as a fact witness.

THE COURT: Thank you. You've may continue.

MR. BAKER: I don't remember where I was at, Your Honor.

THE COURT: Well, let me ask you one more question. This is a little bit of a digression, but in this case, Liberty disagreed with the umpire's decision and, under

the Massey case, was not obligated to comply with that decision. They were not bound by the umpire's decision, and so Liberty rejected it. And let me tell you, there's a little bit of back and forth in the briefs on that issue.

It strikes me -- and I'm giving you a chance to push back on this. And, admittedly, this is sort of a digression. It strikes me that Liberty, because it had the absolute right to disagree with and reject the umpire's decision, that we really can't call it bad faith to have done that. The question is whether Liberty otherwise exposed itself to a bad-faith verdict through its overall handling of the claims or whether Liberty paid the amount due under the policy as opposed to predicating bad faith on the rejection, which Liberty was entitled to do, of the umpire's decision.

Is there any law out there that would support an argument from your clients' perspective that rejecting an umpire's decision is bad faith or is evidence of bad faith?

MR. BAKER: Your Honor, there is not, as it stands today. But I believe that there are certainly room in today's environment and because of the evolution of the claims handling process that it is time, certainly, for the courts to take a hard evaluation of the current law.

My understanding and research and review of the appraisal process in Oklahoma actually predates statehood, that this has always been an ability or capacity for the insured and insurer

to be able to remedy the situation without the need for an attorney. And it was a quick end to expediting, get claims handled, when there was a dispute. That got codified, I believe, in '56 or '57 into law, modified a little bit a couple times over the years, but generally is still in the same form as part of the standard policy that we see today.

And if you read the standard language of the policy, it's a shall, that if --

THE COURT: It's a what?

MR. BAKER: It's a shall. If one side invokes, the other side shall participate. What we see today very frequently is we see the other side refusing to participate.

THE COURT: Okay. Well, that's not our case, right?

MR. BAKER: It's not our case.

THE COURT: Okay. So let me just cut to the chase with you. Do we agree that as long as the -- we'll call it the opposing party, in this case, Liberty -- as long as the opposing party participates in good faith in the process leading to the umpire's decision, then although the party who invoked the appraisal procedure may be bound by the outcome, the other party is not bound by the outcome? Are we together on that?

MR. BAKER: You've nailed it where I was headed. It's the good-faith participation portion of it. So I would agree with the Court that if there is a good-faith

participation and there is compliance with 4803, then, yes, one side, under our current law, is bound and the other -- the invoking party is bound and the noninvoking party is not bound under our current law. And I believe that the court's rejection of good-faith participation is key in that.

THE COURT: Okay. You may continue.

MR. BAKER: I think that that was -- well, I didn't want to go into a dissertation on things that didn't apply, but in regards to this case, the fact pattern I think will reveal itself as we proceed forward and as arguments are made in that regard as far as regression, that Liberty did not participate in good faith, did not -- was not compliant with the statute, and that that changes the perspective of it and throws it back under the very broad, encompassing bad-faith umbrella whenever you don't participate in good faith in it. And you may have signed up and you may have shown up, but if you weren't there in earnestness to begin with to participate, then that's -- that's not good-faith participation.

THE COURT: Thank you.

MR. BAKER: Yes, sir.

THE COURT: I'll hear from the defendant.

MR. O'CONNOR: Thank you, Your Honor.

I don't want to spend too much time correcting the record, but I feel like I need to hit a few items.

One is it's the exception where experts are not used to

assist the trier of fact in claims handling processes. I heard that we don't see a lot of experts anymore. I see them in almost every case. And there's a reason for that, because as you have said in previous decisions, they are of assistance to the trier of fact. And specifically in your Daniel v. Armed Forces cases, you recognize that it would be appropriate for an expert to opine on these issues, that it assisted a -- the trier of fact in what's an incredibly technical and very complicated industry.

And so we have -- we use experts. We've used Mr. Jayne. And Mr. Jayne is present if Your Honor wanted to hear anything from him. But, you know, the issue here is, he's not reaching ultimate conclusions that you or the jury are to determine. He's testifying about insurance industry standards and how that applies in the facts of the case.

THE COURT: Well, and he has given me, on page 12, the obligation to conduct a reasonable and timely claims investigation under the circumstances. Is he going to refer to any more definitive standard, as standards go, than that?

MR. O'CONNOR: He will talk about -- first of all, we've never heard any challenge to him as -- just simply because he's a lawyer. Mr. Jayne is a licensed adjuster. He was on a roof last week. He adjusts claims routinely for many insurance companies. He's general counsel -- outside general counsel for many insurance companies. This is what he

does.  So he does have the expertise.  And I know there seemed to be a concession on qualifications at the outset and then some question of his qualifications as it proceeded.

THE COURT:  Well, with the one exception that I've already mentioned, I don't regard his qualifications as being in issue.  I was amused a few minutes ago to hear that maybe his law degree has a negative impact on his qualifications.  For the reasons that Lee West cited that I referred to a while ago, I don't know that taking the stand and raising your hand and taking the oath with your law degree in your hip pocket really ought to make that much difference one way or the other, but I certainly don't regard it as a negative.  And so you don't need to worry about that.

MR. O'CONNOR:  Okay.  His -- he really advances three principal opinions, which are Liberty timely investigated and evaluated the claim, that Liberty's handling of the claim prior to plaintiffs invoking the appraisal process was within industry standards, and that Liberty's decision not to accept the umpire's award was within industry standards.

When we deposed the plaintiffs, the sole and only issue that they contend was bad faith was Liberty's failure to pay the award.  And that's why we moved for summary judgment.  That's why I think it's appropriate on that issue as well as the other two that join that to have someone say this is how the industry -- this is how the industry acts.  This is what

the industry requires.

And as to the fact that he didn't review or identify in some of his lists certain internal documents from Liberty, plaintiffs have never made any contention that there was a violation of our own internal standards. So that's another kind of look out here, look out here.

And to the extent he keeps -- I'm sorry. To the extent plaintiffs' counsel continues to criticize the support of Mr. Jayne's conclusions, that goes clearly to the weight of the evidence. It's not -- that's not for Daubert consideration, as Your Honor is well aware.

The case law, since we're beyond qualifications, as Your Honor is so well aware, I know, the second step is determining whether his testimony would be relevant, reliable, and helpful to the jury.

THE COURT: Before we move on from any question of qualifications, let me come to one aspect of the matter that I discussed with Mr. Baker, and that is -- I'm looking at page 13 of Mr. Jayne's report. And he says, "It is my opinion that the vast majority of the damage to the plaintiffs' roof was a result of wear and tear rather than wind or hail."

Do you anticipate that we're going to hear anything to that effect from Mr. Jayne when he is called as a witness?

MR. O'CONNOR: No, Your Honor. We have -- we have Mr. Van Dorn as our expert on roofing. He's an

engineer. He'll testify about the inspection of the roof. He has a significant report that was prepared. Mr. Jayne -- the only issue with the roof is it's a fact in this case. And so it's a relevant fact in consideration of whether Liberty complied with the industry standards, but that's -- he's not -- we're not proffering him for this roof was the product of wear and tear. We have Mr. Van Dorn, and they certainly have not sought to exclude Mr. Van Dorn's testimony.

He's going to -- he would testify, Your Honor, as he has in other courts and as other experts have testified in your court, on claims handling and insurance industry standards, and that's his window. You know, while he's a licensed adjuster with a lot of experience on roof claims, that's -- the only reason his testimony would touch on that topic is because that's kind of what the issue is here. But he's not here to opine on the causation issue.

THE COURT: Okay. Well, he has in black letters on white paper. He has opined on that very thing.

MR. O'CONNOR: I understand. And I think you asked me if we intended to put him on the stand on that issue. No, we do not.

THE COURT: Okay.

MR. O'CONNOR: So the main thrust of the authorities that we submitted, Your Honor, establish that it's relevant. Your district, Your Honor, has previously reasoned

that the average juror is not likely to be familiar with the practices and procedures involved in processing insurance claims and concluded that expert testimony on these matters is appropriate and will assist the trier of fact. That's the Seikel decision.

And here Mr. Jayne is offering testimony on Liberty's handling of plaintiffs' claims, including the timeliness of its claims handling, the mechanics of the appraisal process, and other issues that arise. This case is -- is -- I'm sorry. The testimony would undoubtedly be appropriate, and the assertion that it's a legal conclusion is without any support. He's -- Mr. Jayne will not -- would never -- I would never ask him to reach the ultimate conclusions of the case. He's not going to get up on the stand, with all due respect, and say this is bad faith or this is a breach of contract. He's going to assist the jury in determining what are the industry standards and did Liberty comply with them. And he's extremely qualified to do so.

So this is kind of in between my readers and my normal vision, so I'm trying to see this.

THE COURT: Wait until your eyeballs are 75 years old, then it will be even worse.

MR. O'CONNOR: So his -- you know, with respect to the industry standards, it would be proper for him to testify as to the timeliness of the inspection, whether there was --

you know, there were -- and then it's, how did that occur? Well, they sent an adjuster out. They sent an inspector out. They sent a letter. They started investigating the claim. And all of that will go to the appraisal process as well and whether that's an industry standard practice.

And Mr. Jayne has seen those provisions in all -- in policies from tens and tens of insurance companies. So this is not anything unusual. It was certainly within industry standards for Liberty to not include an evaluation of damages to the barn when the plaintiffs never submitted a claim for the barn. It was within industry standards to not accept the umpire's award because, for one thing, the report of the umpire misidentified the type of tile. It was within industry standards for Liberty to take the position that plaintiffs' roof was repairable rather than needing to be replaced. So the list is on and on.

I know that this is not a factual hearing. It's -- but these are exactly the reasons why we have used claims handling experts, why I think courts have concluded repeatedly, even opinions as to Mr. Jayne's assistance to the trier of fact specifically, that this is of assistance in a complicated, regulated field where the jury needs help.

And with respect to the individuals who I heard today initially were experts and then not experts, these are public adjusters. These are public adjusters who are getting paid 15

percent of any additional recovery after they're engaged. So, yeah, they -- I've yet to meet a public adjuster that didn't think a roof needed to be replaced. It's just what happens. And that's what happened here. And they are incentivized, motivated. There is no credibility. That's not an expert. And we'll, when given the opportunity, explain to the Court or the jury why that's not credible.

But we think it is relevant. We think it's reliable. We think there is a -- that he meets every possible criteria to be allowed to testify, to run through the gatekeeping process.

THE COURT: Let me make -- inquire as to one aspect of what plaintiff specifically asks the Court to do. Page 15 of plaintiffs' brief -- and part of this is in parens, as you will hear. "In the alternative, parens, and at a minimum, close parens, it is clear Jayne is not qualified to present opinions concerning the cause and extent of the damage to plaintiffs' property."

Is there any disagreement with that?

MR. O'CONNOR: He would not be opining on the roof issue. This is on a -- whether or not we were reasonable and acted in good faith on the way we handled the claim, that's what Mr. Jayne is here for. He's not here to say I looked at the tile roof, I looked at the damage, and it's wear and tear.

THE COURT: Well, now you're trying to make the motion moot as to that, and it may well be moot based on the

representations you've made. But this is judicial relief that plaintiffs are specifically asking for in the motion. They're asking me, at a minimum, to hold that he may not testify as to the -- that he's not qualified and may not testify "concerning the cause and extent of the damage to plaintiffs' property."

Is there any issue with that?

MR. O'CONNOR: No.

THE COURT: Okay. You may continue.

MR. O'CONNOR: In his expert report -- and I don't want to beat the dead horse, but in his report, Mr. Jayne reaches opinions that are based on the industry standards derived from his years of experience in the insurance industry. He reviewed the relevant documents and the pleadings in the case, he properly opined that -- on defendant's handling of plaintiffs' claims using his specialized knowledge and experience. There's certainly no criticism of his methodology. Plaintiffs have used experts in bad-faith cases -- plaintiffs' counsel, I'm sorry. We routinely do it. We think it's of assistance to the trier of fact. And really, there --

THE COURT: What just --

MR. O'CONNOR: -- there hasn't been any attempt to attack us. I'm sorry, Your Honor.

THE COURT: I can't resist asking you. I'm familiar generally with the little invocation that Judge Seay has been

known to give when the first expert gets called. Have you ever heard Judge Seay's little speech to a jury when the first expert gets called?

MR. O'CONNOR: I don't believe so.

THE COURT: Okay. It's rather entertaining.

MR. O'CONNOR: I've read his reconsideration order of what he thought of those motions, and I've read Judge West's book, but I don't know Judge Seay's --

THE COURT: Well, Judge Seay, I think in a trial in which there are experts -- I think the reason he gets up in the morning and comes to the courthouse is to have the opportunity to tell when the first -- to say when the first expert is called, you're going to hear just exactly what this man has been paid to say. And then when the defendant puts on its case, you're going to hear the defendant's expert say just exactly what he's been paid to say. And then you're going to have to decide which one is on target and which one is not.

But anyway, he seemed to relish that. That's a digression as well.

MR. O'CONNOR: I believe that's all we have, Your Honor.

THE COURT: Thank you.

MR. O'CONNOR: Thank you.

THE COURT: I'm prepared to rule. The motion will be granted in part and denied in part.

The only respect in which the motion is granted -- and I'm specifically asked to do this in the motion and there is no persuasive opposition -- is Mr. Jayne will not be permitted to testify as to the cause of the damage to the roof. That testimony, which is -- that opinion testimony -- and it's clearly styled opinion testimony in his report -- is proffered in a Rule 26 report as an opinion. Plaintiff asked me to exclude it; it will be excluded. I am not provided any adequate basis upon which to conclude that Mr. Jayne is qualified to expound on the cause of the damage to the roof.

In so doing, of course, I apply the Daubert and Kumho standards with which we are all familiar. I think it may be appropriate -- even though my ruling in a similar situation is attached as Exhibit 5 to Liberty's response, I think it's appropriate, maybe, to touch on a few of the high spots. I'm tempted to just incorporate by reference my ruling in that Laura Daniel case, civil 17-035, but I think it's appropriate to touch on the high spots.

Touching, first of all, on the question of testimony as to legal matters, I think it is important to understand what was before the Court in Specht v. Jensen. The witness -- the expert witness at issue in that case did testify to some of the ultimate issues to be submitted to the jury in that case, and that did include some of the essential elements of plaintiffs' claim. That's apparent from the discussion at 853 F.2d.

807. And the Court of Appeals clearly held, after that part of the opinion, that that was impermissible. The Court noted, and I quote, "The line we draw here is narrow." The Court noted that a witness may appropriately refer to the law in expressing an opinion and may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms.

And I won't repeat the rest of the analysis in Specht v. Jensen; but in my view, it is not at all inappropriate for Mr. Jayne to talk about claims handling standards, even though some substantive principles of law are woven into those claims handling standards because it's -- as I said in that Daniel case, it's really a hybrid situation. We have industry standards and we have substantive legal standards. And I don't think it's inappropriate at all for Mr. Jayne to testify as to what he would suggest is the appropriate standard even though that has legal principles woven into it.

Now, as to -- apart from Specht v. Jensen, which is not, strictly speaking, a Daubert type of issue, but it's not unrelated, but apart from that and turning to the Daubert issues, as such, I'm certainly not going to burden the record with a repetition of my understanding of my obligation as the gatekeeper. That's very adequately covered in Daubert and Kumho and in the Tenth Circuit's decisions in cases like Goebel v. Denver and Rio Grande Western Railroad, 215 F.3d 1083.

On the issue of qualifications, we have what I consider to be the seminal case of Ralston v. Smith & Nephew, 275 F.3d 965. The object of Daubert scrutiny is to ascertain whether the proffered expert testimony is "not only relevant but reliable," as covered on page 589 of the Daubert decision. And as has been pointed out in the briefs, the evaluation for reliability cannot be permitted to evolve into an assessment of the ultimate persuasiveness of the proffered expert testimony.

And aside from that, I'm going to simply refer counsel to my ruling in that Daniel case for further elaboration on my understanding of the appropriate standards. Aside from the one thing that I -- as to which I have definitively ruled, essentially when this case comes on for trial, I'm going to have to just call balls and strikes. And there's not a whole lot that I can do by way of definitive, if you will, topical rulings today.

Here are the standards, and this will be incorporated into the minutes: The proposed expert witness, Andrew Jayne, will be permitted to testify as an expert. The opinions --

And, Lori, you don't need to worry about copying this because I've already got it written down.

The matters that he addresses as an expert must be expressed in substance in his report. That's a Rule 26 requirement.

He may testify as to the applicable standards even though

those standards are partially based on Oklahoma law.

He may opine as to whether those standards are appropriately applied by the defendant or were appropriately applied by the defendant, as long as he does not predicate any of those opinions on any expertise he may purport to have as an expert with respect to the cause of the damage to the roof.

Fourth, he will not be permitted to testify as to how, as a matter of law, any issue in this case should be resolved by the jury.

Fifth, because the facts as to the date of the loss and the date of filing suit are uncontroverted, and because Mr. Jayne is not a percipient witness as to any other facts that may have a bearing on the timeliness of filing suit, he will not be permitted to opine as to whether the suit was timely filed. If the issue of timeliness is submitted to the jury with respect to the claim for breach of contract, the jury will be fully capable of applying the law as set forth in the instructions to the facts as shown by the evidence. And in the Court's view, the issue of timeliness of filing suit is not relevant to the bad-faith claim.

And let me elaborate on that just a bit. We do have the facts as to the date of loss. That's uncontroverted. The fact as to the date of filing suit is likewise uncontroverted. There are other matters that conceivably could be relevant to whether the two-year bar in fact bars

plaintiffs' claim wholly or in part, but that's -- that determination is not specifically spoken to by Mr. Jayne other than his observation that the lawsuit was not filed within the two-year period specified in the policy. That is -- in terms of, if you will, the physical facts as to the date of the loss and the date of filing suit, that is -- those facts are uncontroverted. Where we come out legally, based on those facts, among others, I'm careful to add, is another matter altogether.

So the motion is granted to the extent that I have stated that it is granted. It is otherwise denied as a pretrial Daubert motion.

Now, let me emphasize that. It is denied as a pretrial Daubert motion because I'm going to have to call balls and strikes. I think I have given counsel sufficiently definitive guidance for trial in that, no, Mr. Jayne is not going to be permitted to expound on the law as a straight-up proposition. He is not going to be permitted to tell the jury how it ought to resolve any element of plaintiffs' claim or plaintiffs' claim as a whole.

And I expect -- and, frankly, I don't think it's necessary to emphasize this because I think defendant's counsel is well aware of this. I expect defendant's counsel, in presenting Mr. Jayne's direct testimony, to be mindful of the guardrails that I have established. That leaves room for Mr. Jayne to

talk about the industry standards and as to the way in which those industry standards were applied as this claim was processed by Liberty Insurance Corporation. And to the extent that his testimony on direct examination gets into tender spots in terms of being expounding on the law as such or expounding as to what the verdict of the jury ought to be on this particular issue or that, I'm just going to have to, as I say, call balls and strikes at the hearing.

In the very same breath I'll say that I think plaintiff was certainly justified in filing the motion. My ruling this afternoon is perhaps not as definitive and detailed as might have been desired, but this certainly, at a minimum, has provided all counsel with guidance as to what I will and will not permit at trial.

Anything further this afternoon from the plaintiff?

MR. BAKER: No, sir.

THE COURT: From the defendant?

MR. O'CONNOR: No, Your Honor.

THE COURT: Court will be in recess.

(COURT ADJOURNED.)

CERTIFICATE OF OFFICIAL REPORTER

I, Tracy Thompson, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of Oklahoma, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 16th day of January 2022.


*/S/ Tracy Thompson*
-------------------------------
Tracy Thompson, RDR, CRR
Federal Official Court Reporter